UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CARMELLA BACON | ) | CASE NO. 1:09CV426 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| Defendant | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Carmella Bacon Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The Plaintiff asserts that the Administrative Law (ALJ) erred in his April 23, 2008 decision in finding that Plaintiff was not disabled because she could perform jobs that existed in significant numbers in the national economy (Tr. 20). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

I. PROCEDURAL HISTORY

Plaintiff, Carmella Bacon, filed her application for DIB and SSI on June 7, 2005, alleging she became disabled on February 1, 2005 (Tr. 50, 337). Plaintiff's application was denied initially and on reconsideration (Tr. 42, 46, 331, 335). Plaintiff requested a hearing before an ALJ, and, on April 7, 2008, a hearing was held where Plaintiff appeared with counsel and testified before an ALJ (Tr. 18). Dr. Roland Manfredi and Dr. Kathleen O'Brien, medical experts, and Nancy Borgeson,

a vocational expert, also testified.

On April 7, 2008, the ALJ issued his decision, finding Plaintiff not to be disabled (Tr. 20). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 6). Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g).

## II. STATEMENT OF FACTS

Plaintiff was born on February 28, 1965, which made her forty-three years old when the ALJ issued his decision (Tr. 120, 356). Plaintiff has a tenth grade education and no past work experience performed at a substantial gainful level (Tr. 357).

## III. SUMMARY OF MEDICAL EVIDENCE

On October 29, 2004, Plaintiff made her first visit to a psychiatrist (Tr. 129). At that visit, Plaintiff told Dr. Olufunke Fajobi that she was depressed (Tr. 129). Plaintiff also spoke of a history of substance abuse, including a thirty-day hospital stay in 1994 and cocaine use as recent as June 2004 (Tr. 130). Plaintiff mentioned that she used alcohol to relieve eye openers and tremors, and she maintained that her alcohol usage was limited to forty-eight ounces of beer every other day (Tr. 130). Dr. Fajobi offered Plaintiff a chance to enter into a chemical dependency program, but she refused, saying that she was already scheduled to enter Laura's Christian Home, a thirty-day program (Tr. 133). Dr. Fajobi also prescribed Plaintiff anti-depression and anti-psychotic medication (Tr. 133).

Plaintiff missed her next appointment, and did not see Dr. Fajobi again until January 11, 2005 (Tr. 127). By that time, Plaintiff had been off her medication for one month (Tr. 127). Plaintiff said that she used alcohol "sometimes," but was vague about the quantity (Tr. 128). Also,

she had elected not to go to substance treatment at Laura's Christian Home because its rules were too strict (Tr. 128). Instead, Plaintiff was waiting for an intake appointment with Harbor Lights Substance Abuse Center (Tr. 128). Dr. Fajobi diagnosed Plaintiff with Mood Disorder, Not Otherwise Specified, and alcohol dependence (Tr. 128).

Plaintiff continued to visit Dr. Fajobi through July 2005 (Tr. 120, 122, 124, 126). Although she continued to be "evasive about substance abuse," Plaintiff showed gradual improvement (Tr. 120, 122, 124, 126). By June 10, 2005, Dr. Fajobi reported that Plaintiff reported "improved medical compliance" (Tr. 122). At that visit, as well as a subsequent visit on July 15, 2005, Dr. Fajobi noted that Plaintiff was calmer, less depressed, less irritable, logical and organized in her thought process, smiled simultaneously, had a brighter affect, and did not report delusions, paranoia, or auditory or visual hallucinations (Tr. 122). Dr. Fajobi did write, however, that Plaintiff reported difficulty concentrating, was immature and intrusive, and had questionable judgment and insight (Tr. 122).

On August 5, 2005, Dr. Melanie Bergsten, a state agency examiner, reviewed Plaintiff's medical records and concluded that Plaintiff "appears capable of performing simple tasks which do not require more than [a] minimal degree of interaction with the public" (Tr. 235). Dr. Bergsten based her opinion on Dr. Fajobi's observations, including that Plaintiff had improved significantly since beginning her psychiatric medications (Tr. 235). Dr. Bergsten thought that Plaintiff was partially credible (Tr. 235). Dr. Patrick S. Semmellman, another state agency physician, later adopted Dr. Bergsten's conclusions (Tr. 235).

Soon after Dr. Bergsten issued her report, Plaintiff retained a new psychiatrist, Dr. Melody Deogracias (Tr. 274, 316). Although Plaintiff missed her first appointment (Tr. 281), on September

27, 2005, Dr. Deogracias noted that "[a]pparently, [Plaintiff] is switching providers because she does not like [that] the psychiatrist...[Dr. Fajobi] reported to the SSA that her 'mood has gotten better so benefits were denied'" (Tr. 274, 316). Dr. Deogracias allowed Plaintiff to self-report her symptoms on two questionnaires. On one form labeled, "A helpful depression symptom checklist," Plaintiff checked "yes" to fourteen out of seventeen questions (Tr. 278). On another form labeled, "mood disorder questionnaire," Plaintiff checked "yes" to thirteen out of fourteen items (Tr. 279).

Following Plaintiff's self-reporting, Dr. Deogracias gave a different evaluation than Dr. Fajobi. Dr. Deogracias diagnosed Plaintiff with "Bipolar I disorder, most recent episode, depressed with psychotic features," and alcohol dependency (Tr. 316). However, Dr.Deogracias did note that Plaintiff was alert, coherent, oriented to time and place, clean, neat, age appropriate, and that her thought process was intact and concrete (Tr. 317, 274-279).

Plaintiff then missed her next three appointments with Dr. Deogracias (Tr. 284, 285). On December 12, 2005, Plaintiff called Dr. Deogracias, complaining that her new mood stabilizer medication was giving her headaches, which she had never previously experienced (Tr. 286). Dr. Deogracias prescribed a new mood stabilizer, but noted that Plaintiff's statement about not previously having headaches was "not true" (Tr. 286). On January 4, 2006, Plaintiff told Dr. Deogracias that she hated the homeless shelter where she was living and wanted to be hospitalized (Tr. 287). Plaintiff went to a hospital, where she reported seeing visions and wanting to hurt herself and another individual whose present location she did not know (Tr. 174). Plaintiff denied using drugs or alcohol (Tr. 174), but her urine tested positive for cocaine (Tr. 177). The hospital declined to hospitalize her (Tr. 175).

On February 13, 2006, Plaintiff reiterated that she was angry at Dr. Fajobi because of the information that he provided to SSA (Tr. 289). That same day, Plaintiff asked Dr. Deogracias to fill out an SSA form for her (Tr. 289). Dr. Deogracias refused because the form was supposed to be filled out by the applicant (Tr. 289). Dr. Deogracias noted that Plaintiff did not show any psychotic symptoms or report thoughts of suicide (Tr. 289). Eleven days later, Dr. Deogracias filled out a Medical Source Statement, declaring that Plaintiff could not perform effective work often due to bipolar/psychotic disorder, and that Plaintiff could not "function" due to poor attention and poor concentration (Tr. 260). Dr. Deogracias rated as poor or none almost all of Plaintiff's capabilities to function intellectually and make occupational, personal, and social adjustments (Tr. 259-260). On February 27, 2009, Dr. Deogracias altered Plaintiff's medications because Plaintiff complained that they made her feel "worse" (Tr. 290).

Over the next ten months, Plaintiff missed six out of eleven appointments that she scheduled with Dr. Deogracias (Tr. 292-301, 302-303), and was arrested for cocaine possession (Tr. 360-361). On July 7, 2007, Plaintiff was unkempt and in an unpleasant mood, and Plaintiff blamed her rash, headache, and diarrhea on three separate medications (Tr. 297). But by November 6, 2006, she was well groomed and no longer psychotic, suicidal, loud, "profane," and she said that her medications made her moods "alright" (Tr. 301). After missing two appointments (Tr. 304), on December 18, 2006, Plaintiff saw Dr. Deogracias and requested that Dr. Deogracias complete another medical source statement (Tr. 303). Dr. Deogracias gave the Plaintiff the same functional ratings that she did ten months prior (Tr. 266-267). At that same appointment, Plaintiff mentioned that she had been off of her medication for two weeks (Tr. 303).

-5-

After Dr. Deogracias filled out the second medical source statement, Plaintiff missed her next two appointments, and saw Dr. Deogracias in February and April of 2007 (Tr. 305-307). She told Dr. Deogracias that she received a certificate from Alcoholics Anonymous and completed a drug treatment program that was mandatory under her probation (Tr. 305, 307). But Plaintiff was angry and loud, seemed paranoid, and mentioned that she missed classes required for her probation (Tr. 305, 307). Plaintiff missed her next appointment, and told Dr. Deogracias on July 5, 2007 that she stopped her anti-psychotic medication for a week because it was "too strong" (Tr. 308). Plaintiff saw Dr. Deogracias again two weeks later and on August 28, 2007, both times noting that she had hallucinations and paranoia (Tr. 310, 313, 314). Plaintiff missed her next appointment (Tr. 315), and saw a psychiatrist on November 1, 2007, saying that she had been off of medication for two months (Tr. 323). One month later, Plaintiff told an internist that she drank beer (Tr. 270). Plaintiff did not show up to her next psychiatrist appointment, but, on December 14, 2007 claimed that her medication was too strong (Tr. 322). A nurse cut the dose of her medication, but emphasized the need to comply with her medications, and "advised continued sobriety" (Tr. 322).

Plaintiff missed two out of three appointments in January and February 2008 (Tr. 324, 325, 326). In March 2008, Plaintiff missed another appointment, but, on March 14, 2008, Plaintiff asked a nurse for an update that she needed for her functional assessment for her SSI hearing (Tr. 347). Plaintiff told that nurse that she had been "off her medication for some time," had insomnia, auditory hallucinations, and irritability (Tr. 347).

One month later, on April 8, 2008, Plaintiff requested a letter from a nurse regarding her sobriety (Tr. 345). Plaintiff told the nurse that she was "clean and sober for a few days now," and attended AA meetings, though not regularly (Tr. 345). The nurse noted that Plaintiff was alert,

coherent, oriented to time and place, had a concrete thought process, and did not report psychotic, suicidal, or homicidal thoughts (Tr. 345). But Plaintiff did seem anxious, irritable, restless, spoke fast, and had a labile affect, limited insight, and fair judgment (Tr. 345).

IV. SUMMARY OF TESTIMONY

The Plaintiff testified, in relevant part, that she is single, unmarried, with grown children, born on February 28, 1965 and currently age forty-three. She was thirty-nine on February 1, 2005, her alleged onset date of disability. She completed ten years of school and also a nine month course in nurse's home health aide. She has had temporary jobs cleaning a sports stadium, temporary service, food stand worker, etc. She was arrested in 2006 for cocaine possession, for which she received probation and took classes. She is unable to work because of high blood pressure, arm pain, manic depression [bipolar], and alcoholism (Tr. 356-369).

Regarding the Plaintiff's physical complaints, Dr. Manfredi testified that the medical evidence showed arthritis of the cervical and lumbar spine, which was not of listing severity, but minor, and responded to medication. Dr. Manfredi limited the Plaintiff to lifting twenty pounds due to these spine problems (Tr. 369-370).

Regarding the Plaintiff's psychological impairments, Dr. O'Brien testified that the medical record showed diagnosis of mood disorder, NOS, with a more recent diagnosis of bipolar disorder, with psychotic features, and treatment, and ethanol dependence, as recently as December 2007, and history for drug abuse and an arrest in 2006 for cocaine. Dr. O'Brien opined Plaintiff's condition met "A" criteria of 12.04 Affective disorders, but not the necessary "B" or "C" criteria, and, thus, she was not disabled under the mental listings, including 12.04. The Medical Expert noted that, despite an AA certificate and seeing a parole officer and some notation of improvement, she was still

-7-

alcohol dependent in December 2007, and the Medical Expert was "concerned" that the Plaintiff was still using then, the last date of record. She further opined that there would be a big improvement in the Plaintiff's functioning, if she stopped using ethanol and also started taking her medication. Dr. O'Brien noted no evidence of psychosis, and the MRFC by the TPMD was not supported considering also the Plaintiff was hospitalized and the notes were inconsistent with the evidence (Tr. 371-375).

Finally, the Vocational Expert (VE) testified that the Plaintiff has no past relevant work. In response to a hypothetical question, involving an individual with similar age, education, work history and RFC, the VE testified that such a person could do the following light unskilled jobs: cleaner/housekeeping, 2,500 jobs in northeast Ohio, 12,000 jobs in the national economy; visual inspector, 17,000 jobs in northeast Ohio and 300,000 jobs in the national economy, and cashier II, 14,000 jobs in northeast Ohio and 1,600,000 jobs in the national economy; and could do the following sedentary unskilled jobs: assembly, 2,150 jobs in the northeast Ohio region and 164,000 jobs in the national economy; office clerk, 2,300 jobs in the northeast Ohio region and 330,000 jobs in the national economy; order clerk, 400 jobs in the northeast Ohio area and 48,000 jobs in the national economy. If one considers that person could do simple tasks but with minimal public interaction, the VE said the cashier jobs were out though contract was superficial, but she could do the other jobs, noting the assembly jobs were in large numbers. In response to counsel's question, the VE testified that if a person was off task more than occasional, such a person could not work (Tr. 375-380).

V.      STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to

disability insurance benefits.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c)and 416.920(c)(1992);

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d) and 416.920(d)(1992).

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992).

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.  (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992).  The Plaintiff has the burden of going forward

with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the Plaintiff, considering her age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applies the correct legal standards.

## VII. ANALYSIS

The ALJ conducted the five-step process in determining whether Plaintiff was entitled to benefits, as described in 20 C.F.R. Sections 416.920 and 416.1520. The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since February 1, 2005, the date that Plaintiff alleges she became disabled (step one) (Tr. 20). The ALJ next found that Plaintiff had the following severe impairments: arthritis, mood disorder not otherwise specified, bipolar disorder with psychotic features, and alcohol dependence, but that these impairments did not meet or equal the listed impairments of 20 C.F.R. Pt. 404, App. 1 (steps two and three) (Tr. 21-22).

The ALJ then determined that Plaintiff could work a forty-hour week at a job that required "unskilled simple tasks, minimal superficial contact with the general public," and met certain other minor physical restrictions (Tr. 22). In making that determination, the ALJ concluded that the

medically-expected impairments could not be expected to cause Plaintiff's alleged symptoms (Tr. 23). In addition, the ALJ found the Plaintiff to not be credible regarding her description of the intensity, persistence, and limiting effects of her alleged symptoms (Tr. 23). In support, the ALJ cited Dr. Olufunke Fajobi, whom the ALJ referred to as the "treating psychiatrist" (Tr. 23). Dr. Fajobi described Plaintiff as less irritable, adequately groomed, and smiling spontaneously when on medication (Tr. 23, citing Tr. 120).

Dr. Kathleen O'Brien, the medical expert at the hearing, further explained that Plaintiff undermined her treatment by not complying with her medications. She noted that the medical records made "repeated references" to Plaintiff running out of, not taking, or demanding different medicine (Tr. 372). Dr. O'Brien also testified that Plaintiff's history of substance abuse, particularly alcohol, "really impacted [Plaintiff's] ability to get adequate treatment for her bipolar disorder" (Tr. 372). Dr. O'Brien concluded that if Plaintiff was compliant with her treatment and did not abuse alcohol and cocaine, "there would be a great deal of improvement" in her symptoms (Tr. 374). In citing the observations of Dr. Fajobi and Dr. O'Brien, the ALJ found that the opinion of Dr. Melody Deogracias, Plaintiff's second treating psychiatrist, was not controlling (Tr. 231). The ALJ made this finding because Dr. Deogracias placed unreasonably severe limitations on Plaintiff's work-related activities, despite medical evidence which indicated that Plaintiff could work if she followed her treatment and did not abuse alcohol and drugs (Tr. 23).

The ALJ next found that Plaintiff had no past relevant work (step four) (Tr. 24). Finally, the ALJ ruled that Plaintiff could perform jobs that existed in significant numbers in the national economy (step five) (Tr. 24).

Plaintiff asserts only one issue in her brief:

1. Whether the ALJ committed substantial error by failing to give good reason for not giving controlling weight to the opinion of the examining physician. Plaintiff claims that "[t]he ALJ erred in failing to give appropriate deference to treating psychiatrist [Dr. Deogracias]" (Pl. Brief 9 (emphasis added)). However, the ALJ relied primarily on Plaintiff's other treating psychiatrist – Dr. Fajobi – in rendering his decision (Tr. 23).

Before Plaintiff ever saw Dr. Deogracias, she was treated by Dr. Fajobi. As Plaintiff's treating physician for ten months (Tr. 120-134), Dr. Fajobi wrote that Plaintiff's condition had improved after she began taking medication (Tr. 122). Specifically, he observed Plaintiff becoming calmer, less irritable, less depressed, smiling spontaneously, having a brighter effect, being logical and organized in her thought process, and not showing evidence of delusions, paranoia, or auditory or visual hallucinations (Tr. 122). Based upon Dr. Fajobi's findings, Dr. Bergsten and Dr. Semmellman opined that Plaintiff could perform "simple tasks which do not require more than [a] minimal degree of interaction with the public" (Tr. 235).

After being denied for SSI and DIB, Plaintiff changed psychiatrists because Dr. Fajobi wrote of her improving condition (Tr. 274, 289, 316). Hence, Plaintiff sought out Dr. Deogracias. Unlike Dr. Fajobi, Dr. Deogracias opined that Plaintiff could not "function," and rated Plaintiff's mental abilities necessary for work almost entirely as "[p]oor or [n]one" (Tr. 259-260). The ALJ discounted the opinion of Dr. Deogracias, noting that "[e]ven [Plaintiff's] treating psychiatrist [Dr. Fajobi] noted Plaintiff was less irritable, adequately groomed, smiled spontaneously when on medication" (Tr. 23). Based upon this evidence, the ALJ correctly concluded that Plaintiff's impairments would not be severe enough to prevent her from working if she actually took her medication (Tr. 23).

Because Dr. Fajobi's observation (that Plaintiff could function when she took her medications) was supported by the record, the ALJ was correct in giving more weight to Dr. Fajobi's observations than to Dr. Deogracias' opinion. *Kirk*, 667 F.2d at 536; *Cox*, 295 F.App'x at 35. ("This Court generally defers to an ALJ's decision to give more weight to the opinion of one physician than another where, as here, the ALJ's decision is supported by evidence that the rejected opinion is inconsistent with the other medical evidence in the record.").

Dr. Fajobi concluded that Plaintiff's impairment responded to treatment. After Plaintiff stopped seeing Dr. Fajobi, the record is filled with Plaintiff admitting that she was not taking her medications. Often those admissions followed periods where the Plaintiff missed doctor's appointments. For instance, after missing two appointments in December 2006 (Tr. 304), Plaintiff mentioned that she had been off of her medication for two weeks (Tr. 303). Plaintiff would miss a few appointments and provide an excuse as to why it was impossible for her to take her medication. In one such instance, Plaintiff missed her two scheduled appointments in October and November 2005 (Tr. 284, 285), finally visiting Dr. Deogracias on December 12, 2005 (Tr. 286). At that appointment, Plaintiff complained that her medications gave her headaches, a symptom that she claimed to have never previously experienced (Tr. 286). Dr. Degracias remarked that Plaintiff;'s comment about never previously having headaches was "not true" (Tr. 286). Similarly, after failing to show up at an appointment (Tr. 309), Plaintiff told Dr. Deogracias on July 5, 2007 that she stopped her anti-psychotic medication for a week because she had decided that it was "too strong" (Tr. 308). A few months later, Plaintiff skipped an appointment (Tr. 315), and then admitted to Dr. Deogracias that she had failed to take her medication for two weeks (Tr. 323).

-13-

While Plaintiff claims that she saw Dr. Deogracias "no less than twenty-three times," (Pl. Brief 4), she does not mention that she also missed twenty appointments (Tr. 291, 284-285, 293, 295, 296, 300, 304, 306, 309, 314, 315, 320, 324, 326). Plaintiff actually showed up to only twenty-one out of forty-one (52%) of her appointments with Dr. Deogracias' office between September 2005 and March 2008 (Tr. 274, 281-290, 292-301, 303-311, 313-318, 320-326).

Dr. Fajobi noted that Plaintiff's condition improved with increased compliance with her medications (Tr. 322). In addition, Dr. O'Brien dealt with this issue, concluding that Plaintiff would see "a great deal of improvement" if she stuck to her treatment plan (Tr. 374). The ALJ correctly found Dr. Fajobi's observations and Dr. O'Brien's analysis persuasive, and rendered his decision accordingly. Therefore, the Court finds that substantial evidence supports the decision of the ALJ. *Hard away v. Secy. of Health and Human Servs.,* 823 F.2d 922, 927 (6th Cir. 1987) (non-compliance with medications undermine a Plaintiff's credibility); *Washington v. Comm'r of Soc. Sec.,* No. 1:07-cv-230, 2008 WL 4449428 at *7, (finding that an ALJ was supported by substantial evidence when he found a Plaintiff alleging bipolar disorder as well as other impairments to be non-credible partially based upon Plaintiff no complying with medications and missing appointments).

"An individual shall not be considered to be disabled... if alcoholism or drug addiction would... be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. Section 423(d)(2)(C).The Federal Register provides guidance on how to determine whether a drug or alcohol use is material:

> The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

-14-

> In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

20 C.F.R. Section 416.935(b).

In opining that Plaintiff was unable to hold any job, Dr. Deogracias neglected to mention Plaintiff's alcohol or cocaine use. Plaintiff explains this omission by arguing that she had been sober since February 2007 (Pl. Brief 6). Therefore, she claims alcohol and drugs were not a factor in her alleged impairments at the time of the hearing (April 7, 2008) (Pl. Brief 6). In fact, Plaintiff goes so far as to say that "the only other reference to alcohol use in the record, following [Plaintiff] achieving sobriety in February 2007, was [a nurse's note] on December 14, 2007... [which] states, 'Advised continued sobriety'" (Pl. Brief 6). The Court finds that Plaintiff is incorrect in her characterization of the record. There is at least one other place in the record after February 2007 where Plaintiff admitted to using alcohol. On December 3, 2007 (only four months before the hearing), Plaintiff told an internist that she drinks beer (Tr. 270).

Besides evidence of the alcohol and drug use in the record, the ALJ indicated that physicians and nurses often noted that Plaintiff was "evasive" about her drug and alcohol use (Tr. 23). On at least one occasion, Plaintiff was caught lying to an emergency room physician about cocaine use. On January 4, 2007, Plaintiff told that physician that she did not use drugs, yet her urine was positive for cocaine (Tr. 177). There are no subsequent drug tests in the record, but, given Plaintiff's continued alcohol use, the ALJ could reasonably question the accuracy of her testimony about substance abuse. As the fact finder, the ALJ correctly assessed Plaintiff's credibility at the hearing. The Court finds that the ALJ's finding that Plaintiff was only partially credible regarding her cocaine use (Tr. 23) was supported by substantial evidence.

-15-

The ALJ was correct in giving less weight to Dr. Deogracias than Dr. O'Brien. SSR 96-6p recognizes that "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources" when those other physicians have based their opinion on the entire record. SSR 96-6p. In fact, "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source... if it is inconsistent with the other substantial evidence in the case record." SSR 96-2p. The Sixth Circuit has held that an "ALJ may properly discount a treating physician's opinion of disability," and, instead, follow the opinion of a consulting physician which is supported by the medical record. *Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 652 (6th Cir. 2006). Also, the Plaintiff cites a case (Pl. Brief 9), where the Second Circuit commented that, "the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (emphasis added). "[The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (holding that in appropriate circumstances, it was proper for an ALJ to disregard conclusions of a treating physician).

Dr. O'Brien gave a better reasoned analysis of the medical records as a whole that was consistent with the observations of treating psychiatrist Dr. Fajobi (Tr. 120, 374). In addition, Dr. O'Brien considered Plaintiff's alcohol and cocaine abuse, as well as her treatment history (Tr. 372-374). There is no evidence that Dr. Deogracias took into account those factors in her assessment of Plaintiff's limitations. Also, there is no indication that Dr. Deogracias considered Dr. Fajobi's

successful treatment of Plaintiff. Since Dr. Deogracias did not mention these issues, it was proper for the ALJ to give greater weight to Dr. O'Brien. SR 96-2p; SSR 96-2p; *Combs*, 459 F.3d at 652.

Finally, Plaintiff asks this Court to remand her case "to address plaintiff's non-exertional restrictions and obtain further medical and vocational expert testimony" (Pl. Brief 10). The ALJ, however, already addressed Plaintiff's non-exertional restrictions in his decision. Specifically, the ALJ found that the Plaintiff could perform "unskilled simple tasks, minimal superficial contact with the general public, on a regular and continuing basis, which means eight hours a day, forty hours a week, or equivalent schedule, due to pain, depression, etc." (Tr. 22). In addition, both a medical expert and vocational expert testified at the hearing.

## VIII. CONCLUSION

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform jobs that existed in significant numbers in the economy, and, therefore, was not disabled. Hence, she is not entitled to DIB or SSI.

Dated: April 28, 2010                    /s/George J. Limbert
                                                                             GEORGE J. LIMBERT
                                                                             U.S. MAGISTRATE JUDGE